Filed 4/3/25  P. v. Murillo CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082600 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN424606) |
| JORGE MURILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Joseph Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Arlene A. Sevidal and Jon S. Tangonan, Deputy Attorneys General for Plaintiff and Respondent.

Years before the trial in this case, appellant Jorge Murillo sexually assaulted three children.  After the three children became adults, they

disclosed their molests to law enforcement. While all three accusers testified against Murillo at trial, while still minors, two recanted their accusations against him. Consequently, the prosecution called as an expert witness a licensed clinical social worker who described Child Sexual Abuse Accommodation Syndrome (CSAAS). The social worker described generally delayed disclosures, incremental disclosures, and recanting by sexual abuse victims. The defense called its own expert, a psychologist, to testify as to memory and suggestibility; however, the trial court did not permit him to testify as to the specific facts of this case.

On appeal, Murillo argues the trial court made four errors which taken individually or collectively, require reversal. Specifically, Murillo claims that the trial court erred: (1) by abusing its discretion in allowing the social worker's CSAAS testimony because that testimony cannot be limited to a proper purpose, therefore, her testimony violated Murillo's due process rights under the Sixth and Fourteenth Amendments;[1] (2) by instructing the jury with CALCRIM No. 1193, which explains CSAAS testimony, the court reduced the People's burden of proof, also violating Murillo's due process rights under the Sixth and Fourteenth Amendments; (3) by not allowing the defense expert to apply his testimony to case-specific facts, the court violated Murillo's due process rights under the Sixth and Fourteenth Amendments;[2] and (4) the cumulative effect of these errors violated his due process rights under the Sixth and Fourteenth Amendments.

---

[1]    Murillo also argues that if counsel failed to preserve this issue for appeal, then she rendered ineffective assistance. Since we find defense counsel preserved this question for review, we do not address Murillo's ineffective assistance of counsel argument as it relates here.

[2]    See fn. 1, ante.

2

We conclude: (1) the trial court did not abuse its discretion by admitting the CSAAS expert testimony; (2) although the current version of CALCRIM No. 1193 does not correctly explain the law regarding CSAAS testimony, the error here was harmless; and (3) the trial court did not abuse its discretion by disallowing the defense expert to apply case-specific facts to his testimony. Finally, because we find but one error and it was harmless, we reject Murillo's due process arguments. Therefore, we affirm Murillo's conviction.

FACTUAL AND PROCEDURAL BACKGROUND

In 2022, the People charged Murillo with eight counts of oral copulation with a child 10 years old or younger (Pen. Code,[3] § 288.7, subd. (b)) related to victim E.L., two counts of lewd acts upon a child under the age of 14 years by use of force or violence (§ 288, subd. (b)(1)) related to victim D.C., and 11 counts of lewd acts upon a child under the age of 14 years (§ 288, subd. (a)) related to victim J.L. On eight section 288, subdivision (a), counts, the People added special allegations under section 801.1, subdivision (a)(1),[4] while on the remaining three counts, the People alleged section 1203.066,

---

[3] All further undesignated references are to the Penal Code.

[4] Section 801.1, subdivision (a)(1), states, "Notwithstanding any other limitation of time described in this chapter, prosecution for a felony offense described in Section . . . 288 . . . that is alleged to have been committed when the victim was under 18 years of age, may be commenced any time prior to the victim's 40th birthday."

subdivision (a)(8), violations.[5] Murillo pled not guilty to all charges and denied the allegations.

A. *Pretrial Motions*

During motions in limine argument, the prosecution moved to admit expert testimony to dispel general misconceptions regarding the child molestation victims' failure to disclose their abuse immediately. The prosecutor did not give the CSAAS expert documents related to the case and would not elicit from the witness any case-specific facts. In its motion, the prosecution identified the misconceptions it sought to dispel, including that: (1) the victim would quickly report the incident in full detail; (2) if a victim "did not appear outwardly frightened, upset, or traumatized by the Defendant's conduct, the[n] the molest did not occur"; and (3) those who molest children are primarily adults unknown to the children. The defense objected to the motion and sought to exclude CSAAS evidence under *People v. Kelly* (1976) 17 Cal.3d 24, and Evidence Code section 352. The court granted the motion to permit the expert testimony in the prosecution's case-in-chief, explaining: "Historically, the Courts of Appeal have found this to be relevant to dispel misconceptions or if the victim's credibility has been attacked. These are all incidents where the disclosures were some time after the

---

5    Section 1203.066, subdivision (a), states that, "probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for, any of the following persons: [¶] . . . [¶] (8) A person who, in violating Section 288 . . . , has substantial sexual conduct with a victim who is under 14 years of age." " 'Substantial sexual conduct' " is "penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender." (§ 1203.066, subd. (b).)

4

alleged conduct, anywhere from 4 to 10 years after. I do think the People are entitled to call an expert to testify as things which would disabuse the jury's misconceptions."

The court then explained it intended to inform the jurors about the limited use of CSAAS testimony, both when the expert testified and as part of the posttrial jury instructions. Defense counsel agreed, "in light of the court's ruling" that admitted CSAAS evidence, CALCRIM No. 1193 should be given at those times. Defense counsel did not object to the language of the instruction.

Defense counsel then raised the admissibility of its expert testimony "to discuss the reporting and discuss different issues related to the witness testimony . . . includ[ing] the context of the allegations, passage of time, repeated questioning and cross-contamination." The defense expert had reviewed discovery in the case, and the defense sought to have him "provide information [about] what types of things are cross-contamination." The court ruled that the defense expert's testimony would be limited to generic testimony, which could in essence include analogous hypotheticals but not the details of the specific case.

B. *Trial*

The trial began on April 18, 2023. Trial testimony relevant to the appellate issues was as follows.

1. *Testimony of J.L.*

Murillo moved in with J.L. and E.L.'s mother, Laura, when J.L. was around six years old, E.L. was one or two years old, and their older sister was nine or 10 years old. Murillo and Laura got married a few years later in 2005.

5

J.L. testified that, on multiple occasions over the course of several years beginning when she was seven or eight years old, Murillo exposed his penis to her, rubbed his penis against her hand and legs, straddled her buttocks with his penis against her while giving her a "massage" under her shirt, and otherwise touched her inappropriately while lying in bed with her. The "massages" while he straddled her, for example, occurred approximately two times a month until J.L. was around 11 or 12 years old. Later, when J.L. was 13 years old, she awoke to Murillo touching her vaginal area. This happened a second time when J.L. was 17 years old. After that, she refused to sleep at her mother's house.

J.L. reported Murillo's assaults on multiple occasions over the years. The first time, in 2005 at the age of eight or nine, she reported the incidents to her older sister. Her sister confronted Laura, who then became angry at J.L. for accusing Murillo of molest. !(5 RT 455)! Another time, about five years later when J.L. was 14 or 15 years old, she told her then-boyfriend. J.L.'s boyfriend then confronted Laura about the assaults. In response, Laura became angry, locked J.L. in a bedroom, told her she was lying and causing problems with the family, and threatened to take her to a mental health facility. Because of her mother's reactions and the threat of being placed in a facility, J.L. wanted it to "all be over" so she recanted her accusations, claiming she fabricated them. In 2016, J.L. went to law enforcement and disclosed to them how Murillo assaulted her.

To undermine J.L.'s credibility, defense counsel used her cross-examination to establish that J.L. did not tell her therapist in either elementary school or middle school that she was sexually abused. Further, J.L. lied to her family about when she would visit a boy she was dating. The defense also elicited testimony that D.C.'s mother called J.L. in February

6

2021, and the two spoke about Murillo's abuse of J.L.  J.L. also testified that she spoke to D.C. one time.

2. *Testimony of E.L.*

E.L. testified that, between the ages of four or five and seven, Murillo forced E.L. to perform oral sex on Murillo around two times per month.  In 2012, when E.L. was 10 years old, he reported the abuse to Laura and his two older sisters.  Because Laura reacted in a frantic, "shocked, aggressive, and irrational" manner and made him confront Murillo, E.L. was scared and stated his accusations were a lie.  By lying he hoped "it would go away."  In 2016, E.L. was angry he had to deal with Murillo every day, and he reported the abuse to his aunt and his therapist.  He then filed a police report.

3. *Testimony of D.C.*

For several months in 2010 or 2011 when D.C. was five years old, she and her mother lived in a mobile home on the same property as Laura and Murillo.  During that time, Murillo got in bed with D.C., exposed his penis to her, and forced her to touch it with her hand.  On another occasion, Murillo was in bed on top of D.C., who was laying on her back with her legs apart, and she felt a very sharp pain in her vagina.  In 2021, D.C. told her mother about the assaults.

On cross-examination, the defense attorney questioned D.C. regarding differences between her trial testimony and preliminary hearing testimony.  Defense counsel established that D.C. did not disclose the sexual abuse to a counselor D.C. saw weekly from 2017 to 2020.

4. *The People's CSAAS Expert*

The People presented a licensed clinical social worker, Christina Shultz, who testified as an expert on conducting forensic interviews with child sexual abuse victims and myths and misconceptions surrounding child

7

sexual abuse. For this case, she did not conduct any interviews or review any related reports.

Prior to Shultz's testimony, the court instructed the jury using a modified version of CALCRIM No. 1193:

> You will hear testimony from Ms. Shultz regarding child sexual abuse disclosure. Child sexual abuse disclosure testimony relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the disclosures are offered only to explain certain behavior of an alleged victim of child sexual abuse.
>
> Ms. Shultz's testimony about child sexual abuse disclosures is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes of which he was not charged. You may consider this evidence only in deciding whether or not the complaining witnesses or alleged victims in this case's conduct was consistent with the conduct of someone who has been molested and in evaluating the believability of the alleged victims.[6]

Specifically, Shultz testified as to patterns of delayed disclosure, gradual or incremental disclosure, and recanting. First, as to delayed disclosure, she testified that "the vast majority of [child sexual abuse victims] do not make an immediate outcry," and the delay may be months or years. She explained that the closer the relationship of the victim to the offender, the more likely there will be a longer delay in disclosure. Additionally, she testified that younger children are more likely to delay disclosure, since they may not initially understand that the abuse was wrong. She further described that "[m]ore often than not there is a bond and some sort of

---

[6] The court modified CALCRIM No. 1193 by changing the phrase "child sexual abuse accommodation syndrome" to "child sexual abuse disclosure." Following prior cases and the parties' briefs, we use the term CSAAS.

8

attachment" between the victim and the offender, so the child may want to avoid getting the offender in trouble or causing consequences to their relationship. Another reason a victim may delay disclosure is fear that he or she will get in trouble or that others will not believe him or her.

Regarding gradual or incremental disclosure, Shultz explained that disclosure is considered a process that can occur over time. A person begins by sharing a small amount of information to gauge the listener's reaction. Then, if the child feels believed or supported, he or she may provide further information, including additional incidents or more details. Further, the amount of information may vary depending on how comfortable the child feels with the listener, such as a law enforcement officer, a child protective services worker, or a therapist.

Finally, as to recanting, Shultz explained that after reporting a sexual abuse incident, a child may say it did not happen. One major factor in whether a recantation occurs is whether the child feels supported by a non-offending parent. If the child feels supported and believed, he or she will likely remain resolute; if the child does not feel believed, and a non-offending parent shows support for the offender, there is a higher chance he or she will recant.

As part of the discussion on recantation, Shultz made brief, general references to studies involving confirmed cases of abuse. Shultz stated, "[M]any of those kids, I believe up to half, denied all together." There was no objection to the mention of these studies.

The defense objected, however, to other aspects of Shultz's testimony. The objections included Shultz's use of the language "more often than not," referring to the preexisting relationship between the victim and offender and the reference to the likelihood of the child to recant. The trial court overruled

9

the objections but reminded the jury, "[T]his is limited to general class characteristics not to prove that abuse did happen or didn't happen, just for you to evaluate the facts as given to you in evaluating credibility of the complaining witnesses."

Shultz agreed that no two people are the same and various factors influence disclosure.

After the close of the prosecution's case, the court dismissed two section 288.7, subdivision (b), counts and one section 288, subdivision (a) count.

5. *Defense Expert*

The defense called a psychologist, Dr. Bradley McAuliff as an expert to testify on children's suggestibility and forensic interviewing.[7] He explained, "Suggestibility is a broad term [used] to look at different factors that essentially influence the accuracy of memory." He explained that various factors impact memory, including: the context of the allegation, family and peer relationships, age, questioning by an authority figure, cross-contamination, and stereotype induction.

The trial court permitted the defense to question Dr. McAuliff regarding general concepts, including factors that affect memory, but not as to the accuracy of the allegations in this case. The credibility of the witnesses, the court explained, is the purview of the jury.

According to Dr. McAuliff, research shows that children and teens tend to be more suggestible than adults, meaning information exchanged from their peers and family members "have an impact on one's memory more so than getting that information from another source." Older children are less

---

[7] Dr. McAuliff also had not conducted a forensic interview with any party in this case.

10

susceptible to suggestibility, with adolescents over 14 years old being the least suggestible, and preschoolers being the most.  Children are also "sensitive to cues from an adult or from an interviewer."  They may make allegations to please a parent or to receive attention and support from a parent.  A concerned parent may ask questions in a certain way, or repeatedly ask questions to ensure a child is safe, and the questioning may impact the child's memory of the event.  The child may then embellish or exaggerate.

Next, Dr. McAuliff testified that research shows that memory becomes weaker as time passes.  The passage of several months or years is a long period of time over which "memory trace can get incredibly weak."  Memory trace is information we obtain through our senses that becomes part of our memory for an event.  As time passes, other events and material are "sources of potential contamination for a weak memory trace."  However, Dr. McAuliff agreed that "core" or "central" details, such as the touching involved in an incident of abuse, are more resistant to suggestibility than "peripheral details," such as dates.

Additionally, Dr. McAuliff testified as to "cross-contamination," meaning information about an event derived from a source other than the child involved.  Cross-contamination can occur, for example, when two witnesses share information, when a child overhears a conversation between others about the event, or when the same interviewer communicates with multiple witnesses.

Dr. McAuliff then discussed CSAAS evidence, stating that it is not generally accepted in the scientific field because it did not include the comparison group of children falsely alleging abuse.  Further, the scientific

11

community agrees that other plausible explanations exist for delay, intermittent disclosure, and recantation.

When instructing the jury after closing arguments, the trial court again repeated the modified CALCRIM No. 1193 instruction.[8]

The jury found Murillo guilty on all remaining counts. The court sentenced Murillo to a term of 40 years consecutive to a term of 90 years to life in prison.

## DISCUSSION

A. *The Trial Court Properly Admitted CSAAS Testimony*

Murillo argues the trial court erred by admitting CSAAS testimony because that testimony cannot be limited to a proper purpose, necessarily suggesting certain behaviors are "consistent with — or predictive of" child abuse having occurred. He states that Shultz's testimony as given

---

[8] Our analysis of this case uses the CALCRIM No. 1193 as adapted by the trial court and provided to the jury:

> You have heard testimony from experts regarding sexual abuse disclosure patterns.

> Child sexual abuse disclosure testimony relates to a pattern of behavior that may be present in child sexual abuse cases.

> Testimony as to disclosure patterns is offered only to explain certain behavior of an alleged victim of child sexual abuse.

> Testimony about child sexual abuse disclosure pattern[s] is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged.

> You may consider this evidence only in deciding whether or not D[.]C., E[.]L., and J[.]L[.]'s, conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim.

12

exacerbated that problem and was improper because it "put loose percentages to the circumstances under which certain [children's] behaviors occur."

We review the trial court's admission of expert testimony, including the admission of CSAAS expert testimony, for abuse of discretion.[9] (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*); *People v. Lapenias* (2021) 67 Cal.App.5th 162, 170 (*Lapenias*).) " '[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. McDowell* (2012) 54 Cal.4th 395, 430.)

Following a line of appellate court cases, including this court's opinion in *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*), our Supreme Court held CSAAS evidence was "admissible to rehabilitate [a] witness's credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin*, *supra*, 53 Cal.3d at p. 1300–1301.) California courts continued to recognize "the well-established relevance, necessity, reliability, and importance of this evidence." (*People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).)

But CSAAS testimony comes with restrictions. "CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 171.) To keep CSAAS testimony tied to evaluating a witness's credibility, the

---

9     As an initial matter, we conclude Defense counsel's objections in court both in her trial briefs, and orally, were sufficient to preserve these arguments for review.

prosecution must "identify the myth or misconception the evidence is designed to rebut"; the testimony "must be targeted to [the] specific 'myth' or 'misconception' suggested by the evidence"; and "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Bowker*, *supra*, 203 Cal.App.3d 385 at pp. 393–394.) To identify a myth or misconception, the prosecution need not expressly do so on the record but may rely on "the victim's credibility [being] placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745.) In this case, the prosecution's in limine motions explicitly identified common misconceptions of abuse the CSAAS testimony would target, including delayed reporting, gradual reporting, and recanted abuse allegations.

Indeed, each prosecution witness testified about her or his own experiences with Murillo and their ensuing self-impeaching behaviors, including delayed or incremental reporting and recantations. Shultz's testimony properly "targeted" the " 'misconception[s]' suggested by the evidence." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.) Each sexual assault witness "delay[ed] a significant period of time before reporting an incident or pattern of abuse," permitting expert testimony "that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*Ibid*.) Testimony from J.L. and E.L. about recanting also made relevant Shultz's testimony that past research revealed "such behavior is not an uncommon response for an abused child." (*Ibid*.) The trial court reasonably determined that an expert's general experience about this specific conduct was relevant and admissible "for the purposes of assessing [the witnesses'] credibility." (*Lapenias, supra*, 67 Cal.App.5th at

14

p. 172.)  Finally, prior to Shultz's testimony, the trial court instructed the jury that her testimony could not be used to determine whether sexual abuse occurred, but only to evaluate the credibility of the witnesses accusing Murillo.

Part of Murillo's objection to admitting Shultz's testimony is that her terms and phrases such as "more likely" and "more often than not" were "loose percentages" that did more than simply discuss common myths about responses to sexual assault.  Rather, these descriptions rendered Shultz's testimony improperly predictive of abuse.  As support, Murillo cites to *People v. Julian* (2019) 34 Cal.App.5th 878, 885.  In that case, the expert testified: "The range of false allegations that are known to law enforcement or [Child Protective Services] . . . is about as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations." (*Id.* at p. 883, italics omitted.)  The court concluded that this "92 to 99 percent probability evidence invited jurors to presume Julian was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 886.)

Another court  explained the concern created by the testimony in *Julian*: "The problem in . . . *Julian* was not that the CSAAS expert used statistics in his testimony but that he used statistics conveying that complainants almost always tell the truth — and therefore that the defendant was most likely guilty." (*People v. Sedano* (2023) 88 Cal.App.5th 474, 481, italics omitted.)  In this case, Shultz did not testify that child sexual abuse victims nearly always, or even "likely" or "often," report the truth.  Rather, here Shultz's use of words such as "likely" and "often" permissibly conveyed the relative commonality of those reactions among

15

known victims — not the direct likelihood or probability that a witness's testimony was true or probably true.

We likewise find Murillo's citation to *People v. Clotfelter* (2021) 65 Cal.App.5th 30, unpersuasive. In that case, the prosecution called an expert to testify about CSAAS. (*Id.* at p. 62.) But the alleged victims had never reported any sexual abuse, the victims consistently denied any such abuse by the defendant, there was no evidence of abuse, delayed reporting, incremental disclosures, or recanting of sexual assault, and the victims' parents — mandated sexual abuse reporters — also never saw anything of which to be suspicious or concerned. (*Id.* at p. 64.) During *Clotfelter*'s closing argument, the defense stated that the evidence showed "the victims never thought they were victims and they didn't act like victims and they didn't present like victims and no one noticed signs that they were victims." (*Id.* at p. 63.) During rebuttal the prosecutor elevated CSAAS testimony into actual evidence to use against the defendant. The prosecutor said CSAAS evidence *supported* the state's allegations that abuse occurred because "victims don't always show signs of abuse." (*Ibid.*, italics omitted.) That was an impermissible use of CSAAS evidence because it posits that *not* showing signs of sexual assault is its own evidence showing that sexual assaults occurred. (*Id.* at p. 64 ["this is precisely the argument that the prosecutor was making to the jury: that it could use the CSAAS testimony to infer that Steven, B.H. and E.H. were victims of the crimes charged"].) That argument converted the CSAAS testimony from information used to rehabilitate damaged credibility into independent evidence in support of conviction.

That did not occur here. In the instant matter, the jury heard evidence from Murillo's accusers of delayed and gradual reporting as well as recanting. Using this, defense counsel attacked the credibility of J.L., E.L., and D.C. on

16

cross-examination, putting their reliability in question.  Neither Ms. Shultz nor the prosecutor suggested that delayed or gradual reporting, or recanting, amounted to facts supporting that abuse occurred.  Unlike in *Clotfelter*, the use and nature of the CSAAS evidence was appropriate here.

Nor did admitting the CSAAS testimony violate Evidence Code section 352 by being unduly prejudicial to, or likely "to evoke an emotional bias against," Murillo such that no reasonable court would have admitted the evidence.  (*Lapenias, supra*, 67 Cal.App.5th at p. 174.)  As in *Lapenias*, "the prejudicial impact of the relatively benign CSAAS testimony was likely to have paled in comparison to the charged conduct" of multiple, repeated sex crimes against minors.  (*Ibid.*)  The court made a reasonable determination in its discretion after briefing and argument that the danger of undue prejudice did not substantially outweigh the probative value of the evidence under Evidence Code section 352.

Finally, to prevail on his argument that he was denied due process of law by the admission of CSAAS testimony, appellant must show that the admission of the evidence was erroneous, and that the error was so prejudicial that it rendered his trial fundamentally unfair.  (*People v. Partida* (2005) 37 Cal.4th 428, 436, 439.)  " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  [Citations.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]  'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." ' "  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230.)  Because we find no error in admitting Shultz's testimony,

17

there is no deprivation of Murillo's due process rights under either the Sixth or Fourteenth Amendments.

B. *While CALCRIM No. 1193 Is Incomplete, It Did Not Lower the Burden of Proof, and Any Error Was Harmless*[10]

Murillo argues that CALCRIM No. 1193 inaccurately describes to juries how CSAAS testimony may be used.[11] We find the instruction's current wording is unclear, but conclude any error was harmless given the other instructions read to the jury and the strength of the evidence.

Whether a jury instruction correctly states the law is an issue we review de novo. In determining whether the trial court properly instructed the jury, we consider " 'the entire charge of the court' " rather than focusing on any single instruction. (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

CSAAS testimony assists the jury in placing a child's self-impeaching behavior in a broader context. (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.) Its purpose is to educate triers of fact that children may exhibit a range of reactions to being molested, some of which a jury may find counterintuitive. However, CSAAS testimony is not independent evidence that a molest did or did not occur. As *Bowker* explained, "[i]t is one thing to say that child abuse

---

10    Previous cases approved the instruction in its earlier form. (See, e.g., *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*) ["A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use Ward's testimony to conclude that L.W.'s behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude L.W. was, in fact, molested"]; *Munch*, *supra*, 52 Cal.App.5th at p. 474, quoting *Gonzales*, at p. 504.)

11    The instruction the trial court gave was modified by that court and is different than the standard CALCRIM No. 1193. However, our holding in this section is equally applicable to the instruction the court used and to the pattern CALCRIM instruction.

18

victims often exhibit a certain characteristic or that a particular behavior is *not inconsistent* with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter . . . clearly is not." (*Bowker*, *supra*, 203 Cal.App.3d at p. 393, italics added.)

The wording of CALCRIM No. 1193 changed in late 2022 in response to criticism from two unpublished cases that the instruction was "potentially misleading." (Judicial Council of Cal., Advisory Com. on Criminal Jury Instructions Rep., Jury Instructions: Criminal Jury Instructions (2022 September) (2022) p. 4.) Consequently, the drafters removed a double negative, changing "not inconsistent" to "consistent." Closer examination of the instruction reveals the change opens the instruction to misuse.

Prior to 2022, CALCRIM No. 1193 reflected *Bowker*'s message that after being molested, young sexual assault victims sometimes exhibit paradoxical behavior. The instruction reminded jurors that simply because such self-impeachment occurred, that was "not inconsistent" with being molested. As *Bowker* implies, the purpose of using the term "not inconsistent" in the instruction is to communicate that reactions to actual child sexual assault fall along a spectrum between conduct commonly understood as consistent with molest (e.g., immediate reporting) all the way to behaviors not generally understood as common — inconsistent — reactions to being sexually assaulted (e.g., delayed or incremental reporting). (*Bowker*, *supra*, 203.Cal.App. 3d at p. 393.)

By looking more closely, we see the double negative in this instance served the important purpose of communicating there is a range of possible reactions to child sexual assault. But stating an action is consistent with

19

molest erases the possibilities that the earlier CALCRIM No. 1193 allowed. The new instruction is now easily interpreted by a jury to mean the child's failure to report the assault in fact *supports* a conclusion that a molest occurred.[12] This contravenes the basic premise that CSAAS is not predictive of whether molest occurred in any given situation.

Of course, a child's conduct in a case may legitimately be impeaching, but that is a credibility determination for the jury to make. A correctly instructed jury should emerge with an understanding that, given the context in which a sexual assault on a child occurs, the young person could exhibit a variety of behaviors, some of which will be counterintuitive. We conclude that telling a jury a young person's "conduct was consistent with the conduct of someone who has been molested" inadequately communicates that message.[13]

We find here the error is harmless. As stated above, CALCRIM No. 1193 informed the jury that CSAAS evidence could not be used to determine if Murillo committed any of the charged crimes. The trial judge separately explained during Shultz's testimony that the prosecution could not use her evidence to prove that abuse happened, but only to assist the jury in evaluating the credibility of the witnesses. Further, the trial court explained

---

[12] As the trial court itself stated, "[o]bviously, the expert cannot testify that [the victims'] behavior was consistent with having been abused versus not having been abused." Yet, that's exactly what the current CALCRIM No. 1193 says.

[13] As an example, one way to eliminate the double negative while still reflecting *Bowker*'s concerns with CSAAS testimony could be to instruct the jury — it may consider CSAAS evidence *solely* for the purpose of determining whether the victim's reactions as demonstrated by the evidence are inconsistent with having been molested.

in another instruction the jurors could accept or reject the experts' testimony. (See CALCRIM No. 332.) And Dr. McAuliff testified that CSAAS evidence is not generally accepted in the scientific community. Together these instructions conveyed the limitations on CSAAS testimony. We also hold for the same reasons that the burden of proof was not lessened.

Finally, the evidence against Murillo recounted by three people is overwhelming. In comparison to that evidence, the explanation on recanting was of minimal importance. Despite the delayed prosecution and J.L.'s and E.L.'s single incidents of recanting, they reported the sexual assaults on multiple occasions and, after recanting, testified in front of the jury that Murillo did commit the crimes at issue. They also explained to the jury the reasons they previously recanted. And it is extremely unlikely that the jury was skeptical of the witnesses' testimony but found Murillo guilty because Shultz testified that child abuse victims may delay reporting and recant their disclosures.

The lack of *Bowker*'s language did not affect the verdicts, even if we apply the *Chapman v. California* harmless beyond a reasonable doubt standard. (*Chapman v. California* (1967) 386 U.S. 18, 24.) We find the error here was harmless.

C. *The Court Properly Limited Defense Expert Testimony*

Finally, Murillo contends the trial court erred by precluding the defense expert from testifying as to the specific facts of the case. Murillo complains, "Dr. McAuliff had scientific expertise that could have shown the jury how the allegations against Mr. Murillo could have developed — indeed, he could have shown the jury how the allegations could have been *false*" and "identif[ied] the potential problems with each of the disclosures." In addition, Murillo specifically argues the court should have permitted Dr. McAuliff

21

to testify that "it was not as though [D.C.] being separate from [J.L.] and [E.L.] for many years meant that she could not have been subject to cross-contamination," and that J.L. and E.L.'s father "was a possible source of cross-contamination."

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell*, *supra*, 54 Cal.4th at p. 426.)  We conclude the trial court did not abuse this broad discretion in limiting Dr. McAuliff's testimony.

The trial court ruled based on the legitimate concern that Dr. McAuliff would testify as to whether the complaining witnesses were telling the truth, explaining:  "Your expert cannot conclude X, Y, and Z and tell the jury who they should and shouldn't believe," but defense counsel "can argue to the jury, hey, this is what the expert said, that's what happened in this case, therefore, you should conclude X, Y, and Z."  Indeed, "[t]he general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)  Thus, permitting an expert to opine on "how the allegations" of the specific witnesses in the case "could have been *false*" or as to concerns about witnesses' "disclosures" would have been an improper opinion on the truthfulness of the witnesses' testimony.

Further, the information provided by Dr. McAuliff was sufficient for the jury to apply the general concepts to witness testimony.  (*People v. Page*

(1991) 2 Cal.App.4th 161, 188 ["an expert's thorough description of the general principles to be applied in a given case may make additional (and more specific) expert testimony superfluous"].) Dr. McAuliff testified, for example, that memory weakens over time. Nothing more from Dr. McAuliff would assist the jury in addressing the time that passed prior to J.L., E.L., and D.C.'s reports of abuse. Dr. McAuliff also explained when cross-contamination occurs, including when two witnesses share information or when the same individual communicates with multiple witnesses. There was evidence in the case that J.L. and E.L. knew about each other's abuse, and that J.L. talked to D.C. and her mother. The jury did not need Dr. McAuliff to specifically explain that was a potential instance of cross-contamination. Evaluating whether their communication affected their credibility was properly in the province of the jury.

Finally, an expert may not provide an opinion "based 'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1008, overruled on other grounds.) Murillo complains that the court prevented Dr. McAuliff from testifying as to what "could have been," "potential problems," and a "possible source of cross-contamination." The trial court did not abuse its discretion by excluding such speculative testimony.

Murillo's cited cases do not assist him. The case *People v. Caparaz* (2022) 80 Cal.App.5th 669, 683–684, raised by Murillo is irrelevant because it involved a defense expert who testified that the defendant's admission was false because he was suggestible. In *People v. Wilson* (2019) 33 Cal.App.5th 559, 567, 572, and *People v. Saldana* (2018) 19 Cal.App.5th 432, 448–449, there was no suggestion that the defense suggestibility expert testified about the facts specific to the case.

23

D.  *There Was No Error to Cumulate*

We have concluded that there was no prejudicial error.  "In the absence of error, there is nothing to cumulate."  (*People v. Duff* (2014) 58 Cal.4th 527, 562.)  Further, Murillo's claims that his Sixth and Fourteenth Amendment rights were violated also fail.

## DISPOSITION

We affirm the judgment.


RUBIN, J.

WE CONCUR:


BUCHANAN, Acting P. J.


KELETY, J.